J. Robert Palmer and Virginia W. Palmer v. Commissioner.
Palmer v. Commissioner
Docket No. 60118.
United States Tax Court
T.C. Memo 1959-5; 1959 Tax Ct. Memo LEXIS 242; 18 T.C.M. (CCH) 18; T.C.M. (RIA) 59005; January 21, 1959
Samuel E. Ziegler, Esq., Gibraltar Life Building, Dallas, Tex., for the petitioners. S. George Voss, Esq., for the respondent. RAUM
Memorandum Findings of Fact and Opinion Respondent determined deficiencies in income tax of petitioners in the amounts of $214.20 and $233.10 for the years 1951 and 1952 respectively. The principal issue is whether the respondent erred in disallowing deductions of $1,000 taken by petitioners in their returns for 1951 and 1952 which were based upon a loss of $4,000 claimed to have been sustained in 1951 from a non-business bad debt. Another issue relates to a medical expense deduction taken by petitioners in their returns for the years 1951 and *243 1952. They concede that, if the principal issue is not decided in their favor, the respondent did not err in reducing the amounts of the medical expense deductions claimed in their returns. Findings of Fact Petitioners, husband and wife, are residents of Tulsa, Oklahoma. They filed joint income tax returns for the years 1951 and 1952 with the then collector of internal revenue at Dallas, Texas. J. Robert Palmer will hereinafter be referred to as the petitioner. From April 1, 1946 to August 1950 petitioner was employed by Joseph Bell Martin, who was the owner of the Last Frontier Motel in Dallas. During the period of his employment, petitioner paid some bills of the Motel with his own funds, lent some money to Martin, and did not cash some salary checks received from Martin. In 1950 Martin sold the Last Frontier Motel property to E. E. Brown, and petitioner received from Brown a fifth lien on that property in the amount of $7,000. Petitioner then returned to Martin certain IOU's and other evidence of the indebtedness he had received from Martin. He felt that any debt owing by Martin to him had been satisfied by the fifth lien on the property received from Brown. In 1945 Brown *244 had purchased some real property located in San Antonio, Texas, from Annie Harwell, wife of Robert F. Harwell. The vendor, in the deed conveying the property to Brown, "retained a Vendor's Lien on said property to secure the payment of one note for the sum of $5128.00". On July 31, 1948, Brown entered into a contract to sell this property to Warren L. and Hazel Kreuger for $9,500, $1,000 of which was paid in cash at the time of the sale and the balance of $8,500 was payable in monthly installments of $85.00. The contract provided that upon the full payment of the principal sum and interest the real estate would be conveyed to the purchasers by a warranty deed. On May 21, 1951, when the unpaid balance due from the Kruegers was $7,027.19, Brown assigned the contract of sale to petitioner by a warranty deed. The deed executed by Brown, as grantor, to petitioner, as grantee, reads in part as follows: "The grantee herein takes the herein conveyed property subject to, but does not assume, the unpaid balance of $4,334.77 on vendor's lien note, executed by E. E. Brown, the grantor herein, and payable to the order of Annie Harwell, wife of Robert F. Harwell, as her separate funds and estate, *245 in monthly installments of THIRTY-ONE and 15/100 ($31.15) DOLLARS, or more, including interest at the rate of five (5%) per cent per annum; said original note in the original principal sum of $5,128.00; and further subject to: "Contract of sale executed as of July 31, 1948 by and between E. E. Brown, as Seller, and Warren L. Krueger and wife, Hazel Krueger, of Bexar County, Texas, providing for total consideration of $9,500.00, payable $1,000.00 in cash and the balance of $8,500, being payable in monthly installments of $85.00 each, with an unpaid principal balance on said sale contract of $7,027.19. Said sales contract is hereby assigned and transferred to the grantee." Sometime during the year 1951, after Brown assigned the contract of sale to petitioner, he ceased to make the monthly payments of $31.15 due on the vendor's lien note held by Annie Harwell. Thereafter petitioner made the monthly payments until the latter part of August 1952. The Kruegers and petitioner then entered into an agreement pursuant to which the property was refinanced, the amount due on the vendor's lien note was paid to Annie Harwell, and the difference between that amount and the balance due from the *246 Kruegers on the purchase price of the property was paid to the petitioner. On September 2, 1952, Annie Harwell and her husband Robert F. Harwell executed an instrument in which they acknowledged the full payment of the indebtedness evidenced by the vendors' lien note and released and discharged the property from the vendor's lien. Petitioners deducted $1,000 in their joint income tax returns for each of the years 1951 and 1952 because of a loss claimed to have been sustained in 1951 as the result of a non-business bad debt in the amount of $4,000 becoming worthless in that year. The claimed deductions were disallowed by the respondent. Opinion RAUM, Judge: Petitioner contends that he "suffered a bad debt of $4,000.00 in 1951 upon the default and disappearance of the debtor, Mr. E. E. Brown, and said taxpayer assumed and continued to make payments upon a vendor's lien note of $4,000.00 in order to collect $7,000.00 from a subordinate contract of sale." The pertinent provisions of the Internal Revenue Code of 1939 are set forth in the margin. [1]
*247 The evidence discloses that Brown purchased the San Antonio property from Annie Harwell in 1945 and at that time executed a vendor's lien note in the amount of $5,128.00, which was payable in monthly installments of $31.15. In 1948, Brown entered into a contract to sell the San Antonio property to the Kruegers for $9,500, $1,000 of which was to be paid in cash at the time of the sale and the balance in monthly installments of $85.00 each. No mention was made in this contract of the unpaid balance due on the vendor's lien note. The contract did provide, however, that upon the full payment of the purchase price by the Kruegers, the property would be conveyed to them by warranty deed. In May 1951, when the balance due from the Kruegers was $7,027.19, Brown assigned the contract of sale to petitioner. At that time the unpaid balance on the vendor's lien note was $4,334.77. Some time thereafter in 1951 Brown ceased to pay the monthly installments due on the note, and they were paid by petitioner until the latter part of August 1952. The Kruegers and petitioner then entered into an agreement pursuant to which the property was refinanced, the amount due on the vendor's lien note was paid *248 to Annie Harwell, and the difference between that amount and the balance due from the Kruegers on the purchase price of the property was paid to petitioner. The vendor's lien was released on September 2, 1952. At the trial petitioner testified that when Brown assigned to him the contract of sale of the San Antonio property, he was aware of the vendor's lien note; that it was his understanding that Brown was to continue to make the monthly payments due on this note; that Brown proved to be a "deadbeat", left the country and no one knows where he is; and that when Brown defaulted on the payments on the vendor's lien note, he had to make them. We have carefully considered petitioner's testimony and all other evidence produced at the trial and fail to see how the failure of Brown to make payments on the vendor's lien note after he assigned the contract of sale of the San Antonio property to petitioner in May 1951 caused any debtor-creditor relationship to arise between petitioner and Brown. Annie Harwell was payee of the note and the person to whom the debt evidenced by the note was owed and she continued to be such until the note was paid in 1952. Brown's failure to make the monthly *249 payments due on the note did not have the effect of substituting petitioner for Annie Harwell as the creditor on the note. The evidence indicates that he continued the payments to satisfy the vendor's lien on the property and to enable him to comply with the provisions of the contract of sale requiring conveyance of the property to the Kruegers by warranty deed when they paid the final installment of the purchase price. When he completed the payment of the note in 1952, he acquired the right to be subrogated to all the rights and remedies Annie Harwell had against Brown to compel him to pay his debt. In no circumstances could this form the basis for a bad debt deduction in 1951 in the amount of $4,000. Moreover, even if it be assumed that the right acquired from Annie Harwell in 1952 was worthless because the amounts paid on the note by petitioner could not be recovered from Brown, it is doubtful whether these amounts would in any event be deductible as a loss from a bad debt, wholly apart from the fact that the deduction was claimed for the wrong year. Having been paid to satisfy a lien against the property and to enable petitioner to convey clear title thereto to the Kruegers, they *250 constituted capital expenditures to be added to the cost or other basis of petitioner's interest in the property. Petitioner had the burden of proving that a debt in the amount of $4,000 owed to him by Brown became worthless during the year 1951. He has not sustained this burden and is therefore not entitled to the deductions of $1,000 claimed in each of the years 1951 and 1952. Decision will be entered for the respondent. Footnotes
1. Sec. 23(k)(4). NON-BUSINESS DEBTS. - In the case of a taxpayer, other than a corporation, if a non-business debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. The term "non-business debt" means a debt other than a debt evidenced by a security as defined in paragraph (3) and other than a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Sec. 117(d)(2). OTHER TAXPAYERS. - In the case of a taxpayer, other than a corporation, losses from sales or exchanges of capital assets shall be allowed only to the extent of the gains from such sales or exchanges, plus the net income of the taxpayer or $1,000, whichever is smaller. For purposes of this paragraph, net income shall be computed without regard to gains or losses from sales or exchanges of capital assets. * * * Sec. 117(e). CAPITAL LOSS CARRY-OVER. - (1) Method of Computation. - If for any taxable year beginning after December 31, 1941, the taxpayer has a net capital loss, the amount thereof shall be a short-term capital loss in each of the five succeeding taxable years to the extent that such amount exceeds the total of any net capital gains of any taxable years intervening between the taxable year in which the net capital loss arose and such succeeding taxable year. For purposes of this paragraph a net capital gain shall be computed without regard to such net capital loss or to any net capital losses arising in any such intervening taxable years.↩